UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
VOLT ELECTRIC NYC CORP.,

                Plaintiff,                              Docket No.

       - against -

AMIT PATEL,                                    **COMPLAINT**
GLENN HERTZBERG, and
PAUL YINGLING,

                                              <u>Plaintiff Demands Trial by Jury</u>

                Defendants.
------------------------------------------------------------------X

Plaintiff Volt Electric NYC Corp. ("Volt Electric"), by its attorneys Silverberg P.C., for its complaint against defendants Amit Patel, Glenn Hertzberg, and Paul Yingling alleges as follows:

## Parties

1. Plaintiff Volt Electric is a corporation existing by virtue of the laws of the State of New York, with its principal place of business located in New York, New York.

2. Amit Patel is a Vice President at a company named A.M.E. Inc. ("AME"). Amit Patel runs AME's day-to-day operations. Upon information and belief, Amit Patel is domiciled in New Jersey.

3. Glenn Hertzberg is an AME Vice President. Upon information and belief, Glenn Hertzberg is domiciled in New Jersey.

4. Paul Yingling is an AME manager. Upon information and belief, Paul Yingling is domiciled in New Jersey.

5. This Court has subject matter jurisdiction over the parties because this matter "exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . . citizens of different States."  (28 U.S. Code § 1332(a)(1).)

6. Venue is proper in this district because events arose in New York County, New York. (28 U.S. Code § 1391(b)(2) ("A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.").)

## Background – Volt Electric

7. The Jewish Theological Seminary, located in New York, New York, as owner, hired a company named Henick-Lane, Inc. ("Henick-Lane") as a general contractor to make improvements to the property known as 3080 Broadway, New York, New York (the "Property").

8. Henick-Lane, Inc. hired AME as a subcontractor to perform various electrical work at the Property.

9. In February 2019, AME hired Volt Electric as a sub-subcontractor to perform electrical work at the Property.  Volt and AME executed a written contract, and the contract price was $356,000.

10. The AME "Purchase Order" for Volt's work, which is signed by Glenn Hertzberg, stated: "Furnish and install control wiring as per … drawings."

11. Importantly, the AME "Purchase Order" also stated: "Final terminations are to be done by others."

12. Volt was hired to install electrical piping conduits and to run electrical wires through the conduit.  Volt had no other contractual obligations.

13. Volt performed extra work at Henick-Lane's direction for AME's benefit, and AME was aware of the changed condition requiring the work. By email dated July 26, 2019, Volt requested payment from AME for this work.

14. Volt Electric duly completed all its contractual work, and duly demanded payment.

15. The balance owed to Volt by AME is as follows:

| | | | |
|---|---:|---|---:|
| $ | 356,000 | Contract Price | |
| $ | (24,239) | Insurance Deduct | |
| $ | 8,000 | Extra July 26 email | |
| $ | 6,000 | Extra July 26 email | |
| $ | (96,120) | payment | |
| $ | (36,120) | payment | |
| $ | (10,000) | payment | $ (142,240) |
| $ | 203,521 | Balance Owed | |

16. Starting on July 26, 2019, AME started issuing deduct change orders to Volt.

17. AME's deduct Change Orders claimed that AME had to hire other contractors to complete Volt's scope of work.

18. AME back-charged Volt for work performed by a company named Vanguard Maintenance & Electrical, Inc. ("Vanguard").

19. Vanguard's scope of work, however, was to, "Furnish labor to build and wire panels." This is "termination" type work that is clearly not within Volt's contract of just installing conduit and running cable. Vanguard's daily descriptions of work confirms that Vanguard performed termination work. Vanguard's daily descriptions of work includes relabeling wires, which is likely just relabeling to Vanguard's preferred label descriptions. Vanguard's description of work generally does not include installing conduit and running wire.

20. AME back-charged Volt for work performed by a company named JTE Electrical Services, LLC ("JTE").

21. JTE's scope of work was to, "Provide labor and workmanship and point to point termination for all pending open items."  This is "termination" type work which was clearly not within Volt's contract.

22. AME claims it had to self-perform work that was covered within Volt's contract.

23. AME has "Work Tickets" that AME says describes the work that AME had to self-perform due to Volt.  AME's work tickets, however, do not indicate that AME was generally installing conduit and running wire.

24. **Most importantly:** At no time did AME notify that Volt that Volt was in default with respect to the specific work Vanguard, JTE, and AME were performing.

25. The Volt-AME contract, Section 11.1, states (emphasis added):

> If the Subcontractor fails or neglects to carry out the Work, or to otherwise perform in accordance with this Subcontract, and then fails, within three (3) calendar days after **transmittal of oral or written notice** by AME to the Subcontractor to commence and complete correction of such failure or neglect, then the Subcontractor shall be in "Default."
> Upon Default, AME may, without prejudice to any other remedy:
>     (a) terminate the Subcontract and seek damages . . . ;
>     (b) perform and complete the Work by whatever method AME deems expedient and charge the Subcontractor for all costs, expenses.

26. As noted above, Vanguard produced detailed daily descriptions of the work that Vanguard performed.

27. There is not a single item in Vanguard's daily work list that AME brought to Volt's attention before AME had Vanguard perform the described work.

28. There is not single item of work that JTE performed that AME brought to Volt's attention before AME had JTE perform its work.

29. There is not a single AME work ticket item that AME brought to Volt's attention before AME self-performed the described work.

30. Every time that AME did tell Volt that something was wrong, Volt promptly cured the issue. At every step of the job, Volt went out of its way to assist AME, including Volt working overtime hours.

31. AME's Fake Excuse #1: Despite AME knowing that Volt's contract did not require Volt to perform termination work, AME deducted money from Volt's contract claiming Volt was required to perform termination work.

32. AME's Fake Excuse #2: Despite AME knowing that that AME never gave Volt "oral or written notice" with respect to the specific work items that Vanguard, JTE, and AME performed, AME nonetheless issued deduct change orders to Volt's contract.

33. Had AME given Volt "oral or written notice" of a breach, as required in the contract (and AME drafted the contract), Volt would have investigated the alleged breach. Volt would then have either cured the breach or Volt would have disputed that the work was within Volt's scope of work.

34. Because AME never gave Volt "oral or written notice" of any breach as to any specific work that Vanguard, JTE, and AME performed, AME failed to comply with a contractual condition precedent for asserting damages against Volt.

35. Henick-Lane's documents show that Henick-Lane paid AME $758,932 for the Jewish Theological Seminary work.

36. Henick-Lane's payments to AME are Lien Law Article 3-A trust funds. (Lien Law § 70(1).)

37. These funds do not vest with AME until all AME's subcontractors are paid.  (Lien Law § 70(3).)

38. Volt is a statutory beneficiary to the trust funds in AME's possession.  (Lien Law § 71(2)(a).)

39. In the present case, Paul Yingling was AME's person directly in-charge of the Jewish Theological Seminary project.

40. Paul Yingling made the decision to create fake excuses not to pay Volt.

41. Paul Yingling made the decision to divert Lien Law trust funds and steal Volt's money.

42. Paul Yingling, as an AME manager, reported directly to Amit Patel, AME's vice-president in charge of AME's day-to-day operations.  Paul Yingling reported to Amit Patel multiple times a week.  It is reasonable to conclude that Amit Patel knew and approved of Paul Yingling's plan to divert trust funds and steal Volt's money.

43. At some point in time Glenn Hertzberg became aware that Volt was claiming AME owed Volt money.  Glenn Hertzberg negotiated the contract with Volt.  Glenn Hertzberg was fully aware that Volt's scope of work did not include termination work.  Prior to Glenn Hertzberg executing the AME Purchase Order for Volt's work, Glenn Hertzberg specifically discussed "termination work" with Volt's personnel, and Volt's personnel directly told Glenn Hertzberg that Volt does not do termination work.  This was why Volt expressly excluded termination work from the contract.  Volt's scope of work was limited to installing conduit and running wire.

44. Upon information and belief, Amit Patel and/or Paul Yingling told Glenn Hertzberg the reasons AME was for not paying Volt.  Glenn Hertzberg would have known that AME's

deduct change orders based on Volt not performing termination work were meritless. Yet Glenn Hertzberg, an AME vice-president, failed to take steps to prevent AME from diverting trust funds and stealing Volt's money.

45. On August 23, 2020, Volt demanded that AME produce books and records required to be kept under the Lien Law § 75, which would show how AME used the trust funds received from Henick-Lane.

46. AME failed to produce any books and records.

47. Under the Lien Law, this is presumptive evidence that AME diverted trust funds.

48. New York Lien Law § 75(4) states: "Failure of the trustee to keep the books or records required by this section shall be presumptive evidence that the trustee has applied or consented to the application of trust funds actually received by him as money or an instrument for the payment of money for purposes other than a purpose of the trust as specified in section seventy-one of this chapter."

49. Diversion of trust funds is criminal larceny.

50. Lien Law § 79-a(1) states: "Any trustee of a trust arising under this article, and any officer, director or agent of such trustee, who applies or consents to the application of trust funds received by the trustee as money or an instrument for the payment of money for any purpose other than the purposes of that trust, as defined in section seventy-one, **is guilty of larceny** and punishable as provided in the penal law." (Emphasis added.)

51. New York Penal Law § 155.40 states: "A person is guilty of grand larceny in the second degree when he steals property and when: 1. The value of the property exceeds fifty thousand dollars. . . . Grand larceny in the second degree is a class C felony."

52. Paul Yingling committed Grand larceny in the second degree.

53. Amit Patel committed Grand larceny in the second degree.

54. Glenn Hertzberg committed Grand larceny in the second degree.

55. Based on the fact that diverting trust funds is a crime, New York courts allow victims of Lien Law trust fund diversions to recover punitive damages. (*ARA Plumbing & Heating Corp. v. Abcon Assoc., Inc.*, 44 A.D.3d 598, 598-599 (2d Dep't 2007) (discussing punitive damages in the context of the Lien Law's criminal provision); *Pinnacle Envtl. Sys. v. R.W. Granger & Sons*, 245 A.D.2d 773, 775 (3d Dep't 1997) ("[T]he unauthorized disbursement of trust assets, without satisfying the claims of contractors or subcontractors, constitutes larceny punishable under the Penal Law (see, Lien Law § 79-a) and 'thus, would clearly satisfy the high threshold of moral culpability necessary to support a punitive damages award.'"); *Sabol & Rice, Inc. v. Poughkeepsie Galleria Co.*, 175 A.D.2d 555, 556 (3d Dep't 1991) ("Such conduct, if established, would constitute larceny punishable under the Penal Law (see, Lien Law § 79-a) and, thus, would clearly satisfy the high threshold of moral culpability necessary to support a punitive damages award.").)

56. Corporate officers and agents that divert trust funds are personally liable for such diversion based on the principle that, "[A]n officer or agent of a corporation is personally liable for his acts which constitute a conversion of the property of a third person; it is no answer to such liability that the act was done while the officer or agent was acting for the corporation." (*Ippolito v TJC Dev., LLC*, 83 A.D.3d 57 (2d Dep't 2011).)

57. In addition to liability for breach of trust discussed above, because Amit Patel, Glenn Hertzberg, Paul Yingling dominated and controlled the transactions with Volt, and committed a wrong against Volt, under a piercing the corporate veil theory, Amit Patel, Glenn Hertzberg, Paul

Yingling are each personally liable for AME's failure to pay Volt.

## Cause of Action
## Breach of Trust

58. Volt Electric repeats all prior paragraphs as if fully stated herein.

59. As shown above, Amit Patel, Glenn Hertzberg, Paul Yingling, with larcenous intent, diverted Lien Law trust funds belonging to Volt, and breached their obligations under Lien Law Article 3-A.

60. Amit Patel, Glenn Hertzberg, Paul Yingling breached their fiduciary duties as trustees of Lien Law Article 3-A trust funds.

61. Amit Patel, Glenn Hertzberg, Paul Yingling converted (stole) Volt's trust fund money and diverted Volt's money to AME.

62. Volt Electric has been damaged in an amount of at least $203,521 by AME's trust fund diversion, plus Volt demands punitive damages of $1,000,000.

WHEREFORE, plaintiff Volt Electric NYC Corp. requests the following judgment against Amit Patel, Glenn Hertzberg, Paul Yingling, jointly and severally:

   a. Damages for breach of trust in the amount of at least $203,521, plus punitive damages of $1,000,000, attorneys' fees, and all other remedies under Lien Law Article 3-A; and,

   b. Court costs and disbursements, and such other, further, and different relief as to the Court deems just and proper, including pre- and post-judgment interest, attorney fees, and punitive damages.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury in this matter.

Dated: February 27, 2021
      Central Islip, New York

                                    Silverberg P.C.
                                    *Attorneys for Plaintiff*
                                    *Volt Electric NYC Corp.*

                                    By: __/s/ Karl Silverberg___
                                        Karl Silverberg, Esq.

                                    320 Carleton Ave., Suite 6400
                                    Central Islip, New York 11722
                                    (631) 778-6077